Fletcher H. HANSON et al., Petitioners,

v.

The CHESAPEAKE AND OHIO RAIL-
WAY COMPANY, a corporation,
Respondent.

No. 1061.

United States District Court
S. D. West Virginia,
at Huntington.

Dec. 8, 1964.

Robert O. Ellis, Huntington, W. Va..
(Robinson, Ellis & Rood, Huntington, W.
Va., on brief), for petitioners.

Edwin W. Conley, Huntington, W. Va..
(Huddleston & Bolen, Huntington, W..
Va., on brief), for respondent.

CHRISTIE, District Judge.

This is an action by petitioners under the Railway Labor Act, 45 U.S.C.A. § 151 et seq., seeking enforcement of Award No. 9193 of the Third Division of the National Railroad Adjustment Board, made the 18th day of January, 1960. The award stated that the transfer by the railway company of work from one seniority district to another without consulting the union violated the collective bargaining agreement. A Motion to Dismiss was previously made by the respondent railroad that this Court did not have jurisdiction on the grounds that jurisdiction of the cause was then within the National Railroad Adjustment Board and that the findings of the Board were too vague, indefinite and incomplete to be judicially enforced. In disposing of that Motion this Court found that it did have jurisdiction and that the findings of the Board were judicially enforceable. See this Court's opinion in Hanson v. Chesapeake and Ohio Railway Company, 198 F.Supp. 325 (S.D.W.Va.1961). Now, both parties in this action, alleging that there is no genuine issue of material fact, have moved for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure, 28 U.S.C.A. As its grounds for summary judgment, respondent railroad alleges that the Board's decision is erroneous in holding that there had been a violation of the collective bargaining agreement and that it is unenforceable as a matter of law. If this position is sustained, it will be unnecessary to examine the petitioners' Motion or to consider the issue of petitioners' individual claims on their merits.

The standard of review in these award cases, found in Section 153 (p) of the Railway Labor Act as amended is as follows:

" * * * Such suit in the District Court of the United States shall proceed in all respects as other civil suits, except that on the trial of such suit the findings and order of the division of the Adjustment Board shall be prima facie evidence of the facts therein stated * * *."

In reality, this means that the enforcement suit is a trial de novo on the merits of the claim. Brotherhood of Railroad Trainmen v. Louisville & N. R. Co., 334 F.2d 79 (5th Cir. 1964); Order of Railroad Telegraphers v. Union Pacific Railroad, 231 F.Supp. 33 (D.Colorado 1964). Cf. Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees v. Atlantic Coast Line R. Co., 253 F.2d 753 (4th Cir. 1958). However, the findings and order of the Board, being adverse to the railroad, have the same effect as a shift in the burden of proof since the railroad, which is now appealing from the National Railroad Adjustment Board, has the burden to prove that the award was wrong. Russ v. Southern Ry. Co., 334 F.2d 224 (6th Cir. 1964).

The undisputed facts in this case briefly summarized reveal the following: During the months of March and April, 1955, the Chesapeake and Ohio Railway Company changed its schedule covering package cars of less-than-carload freight whereby freight, which previously had been billed to Huntington, West Virginia, for unloading and transferring into other railway cars for further shipping, was under this new schedule to be billed to Ashland, Kentucky. The Huntington and Ashland stations are about sixteen miles apart and are in different seniority districts. As a result of this increase in bulk-transfer work at Ashland, nine new positions were established there. At the same time, due to the decrease of work at Huntington, the railway company abolished twenty-three positions there [ten clerical (Group 1) and thirteen laborer (Group 3)]. On July 15, 1955, the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees filed a claim against the railway company stating that the collective bargaining agreement they had with it had been breached by the company in abolishing these positions at Huntington. Union and management were unable to settle the dispute so the brotherhood filed its claim with the National Railroad Ad-

justment Board's Third Division. At the initial hearing the Board was deadlocked so a Referee was added to the ten-member board. The relevant portions of the majority opinion are as follows:

"In our opinion, the real question presented by this record is whether or not the changes under consideration amounted to a removal of the work out of one seniority district and into another. Despite the Carrier's arguments to the contrary, we are satisfied that the question must be answered in the affirmative. The practical significance of this situation, the basic facts of which are undisputed, does not differ substantially from any case where the Carrier, for operational or other considerations, decides to withdraw work from the employes who theretofore had performed it and to assign it instead to employes in a different seniority district. There is no doubt but that the realistic and inevitable result of the changes, however they were accomplished, was to cause employes within the Huntington seniority district to lose work they had been performing to employes in another and entirely separate seniority district. The situation is to be distinguished from those where the work was actually abolished.

"Rule 6 of the controlling Agreement, notably sections (c), (d), (e), and (f) thereof, provides that Ashland and Huntington are separate seniority districts that are not to be changed in the absence of agreement between the contracting parties. Those sections, considered together with Rules 1(a) and (b), 3, and 17(e), underline the importance of district seniority.

"It is well settled that seniority is a valuable property right. See Award 4987. That right would be devoid of strength and meaning if it represented merely a paper designation and there was no work for its holders to perform. See Award 5078. The entire purpose and underlying spirit of the seniority provisions require that, in the interest of the employes' seniority, their statutory bargaining agent be consulted before any move of the type in question is made that will impair their valuable seniority rights. Accordingly, not even to consider the effect of the aforementioned changes with the Brotherhood constitutes a violation of Rules 1, 3 and 6 of the Agreement. To hold otherwise would be to encourage the emasculation of that Agreement. Manifestly, operational changes by the Carrier must be effected in a manner that is compatible with its contract commitments."

Sustaining the claim of the brotherhood, the majority opinion concluded:

"All we hold in this case is that before making changes that will shift work out of one seniority district and into another to the obvious detriment of one group of employes, the Carrier must consult the appropriate bargaining representative of the employes affected in a bona fide effort to mitigate the impact of the changes upon those employes. In reaching this conclusion, we have considered the Agreement before us and not the equities of the situation. In our view, this requirement is basic and fundamental to the seniority rights prescribed by that Agreement. There is nothing in the requirement that is harsh, unreasonable, or inconsistent with the duties and privileges of a Carrier."

Therefore, in this action for an order to enforce the Board's award, the issue for decision before this Court is whether there has been a violation of the collective bargaining agreement between the railway company and the union, or more specifically, whether a change in the railway company's freight car schedule is to be considered as a part of "management's prerogative" or to be considered as a violation of petitioners' seniority

rights under the collective bargaining agreement.

The question is a novel one. We have not been cited to a court decision involving this particular issue, and our own research has failed to reveal any case where a similar situation was involved. Generally it may be said that management remains free to control its business except as limited by the collective bargaining agreement. Gunther v. San Diego & Arizona Eastern Railway Co., 198 F.Supp. 402 (S.D.Cal.1961); Rutland Railway Corp. v. Brotherhood of Locomotive Engineers, 307 F.2d 21 (2d Cir. 1962); Texas & N. O. R. Co. v. Brotherhood of Ry. & Steamship Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034; and Beeler v. Chicago R. I. & P. Ry. Co., 169 F.2d 557 (10th Cir. 1948). Thus, the right to create and abolish positions, remove shifts, and change the methods and processes of work would remain with management subject only to the rights of the workers as contained in the agreement. Therefore, we must look to the collective bargaining agreement to determine whether the railway company has bargained away its right to make this freight schedule change without consultation with the union. The alleged violations of the agreement as found by the Adjustment Board have to do with Rules 1, 3, and 6. Rule 1 is the Scope Rule and its pertinent provisions are:

"(a) These rules shall govern the hours of service and working conditions of all the following class of employes:

"Group 1—Clerical Workers: Employes who regularly devote not less than 4 hours per day to the compiling, writing, and/or calculating incident to keeping records and accounts, transcribing and writing letters, rendition of bills, reports, statements, handling of correspondence, checking baggage, freight and material and similar work, and to the operation of office or station mechanical equipment requiring special skill and training such as typewriters, calculating machines, adding machines, bookkeeping machines, tabulating machines, accounting and timekeeping machines, statistical machines, dictaphones, key punch, recordak, and photostat machines, teletype (except teletypes used exclusively in the transmission of messages and reports and located in offices which are equipped with telegraph facilities), and other similar equipment or devices used in the performance of clerical work or in lieu thereof. Also station, store and warehouse general foremen and assistant general foremen; station, store, warehouse and merchandise pier foremen and assistant foremen; at Newport News, Virginia, top and bottom coal pier foremen and assistants, and sprinkler foremen; pursers and assistant pursers, chief clerks, assistant chief clerks, ticket sellers, managers of Zone Revision Bureaus, division storekeepers, stationery storekeepers, car distributors, traveling timekeeping accountants, assistant boatmasters, city ticket agents, assistant city ticket agents, service inspectors-Passenger Transportation Department, supervisors and assistant supervisors of the clerical craft or class, stationmasters and assistant stationmasters.

" *  *  *

"Group 3—Laborers employed in and around offices, stations, storehouses, warehouses, and Newport News-Norfolk Steamer including scrap dock laborers (Stores Department), and those used to adjust overloads and/or transfer bad order loads at freight stations and where it has been the practice to use employes covered by this Agreement, porters, and matrons."

Rule 3 of the Agreement involving seniority is as follows:

"(a) Seniority is established and its exercise allowed as provided by the terms of this agreement. Seniority established hereunder is to be retained by the employe subject to the terms of this agreement while same remains in effect. The two parties signatory hereto have full authority to jointly reach a mutual, definite and final conclusion on any question affecting seniority held under this agreement.

"(b) Except as provided in Section (c) of this rule * * *, employes entering the service do not establish seniority until awarded a rank and file bulletined position, that is, a bulletin for a new position, permanent vacancy, or temporary position or vacancy of 30 calendar days or more duration. Seniority will begin on the date the employe actually performs service on such bulletined position, subject to the provisions of Rule 25.

"(c) Subject to the provisions of Rule 25, Group 3 employes entering the service will establish seniority on the date they are assigned a new position, permanent or temporary vacancy, of 30 calendar days or more duration, except Group 3 employes entering the service used for extra service for 6 consecutive months will establish seniority on the roster in the department in which they perform extra service from date of first service during the 6 months' period.

"* * * *"

Rule 6 outlines the seniority districts thusly:

"(a) Seniority rights of employes in their respective groups in bidding on bulletined positions, and of Group 3 employes in applying for Group 3 new positions or vacancies, will apply as follows:

"First—To all employes on the roster in the department where the vacancy or new position exists on the seniority district.

"Second—To all employes in all departments on the seniority district.
"* * *

"(c) Seniority districts shall not be changed except by mutual agreement between the representatives of the parties hereto.

"(d) Where Group 1, 2 and 3 work is performed in the various departments referred to herein, separate rosters will be maintained for each group.

"(e) Any change in the established rosters must be made by agreement of the parties hereto.

"(f) Seniority districts as referred to in this rule are as follows:

"Huntington District

"West of Morris Creek Junction to Russell Yard limits, excluding Ashland Terminal, and including all intersecting branches, except Big Sandy and Lexington Subdivision.

"Ashland District—Big Sandy District

"Ashland Terminal and east to and including Elkhorn City and west to and including Lexington."

In interpreting these collective bargaining agreements the Court, in N.L.R.B. v. Nash-Finch Co., 211 F.2d 622, 45 A.L.R.2d 683 (8th Cir. 1954), stated,

"Where parties to a contract have deliberately and voluntarily put their engagement in writing in such terms as import a legal obligation without uncertainty as to the object or extent of such engagement, it is conclusively presumed that the entire engagement of the parties and the extent and manner of their undertaking have been reduced to writing."

Our Fourth Circuit has further held that these collective bargaining agreements are like other contracts and should be given a reasonable construction, not one which results in injustice and absurdity. Atlantic Coast Line R. Co. v. Brotherhood of Ry., Etc., 210 F.2d 812 (4th Cir. 1954).

Reasonably interpreted, the various sections of the bargaining agreement involved here, in this Court's opinion, do not show that the railway company has bargained away its right to make the above-mentioned schedule changes. The Adjustment Board itself could not show that the company had bargained such right away. It instead looked to the result of the schedule change and held that since such change did in its practical effect result in the transfer of work from one seniority district into another, thus causing the employees in the Huntington district to lose work they had been performing to employees in another district, such change was a violation of petitioners' seniority rights and that the brotherhood should have been consulted before such change was made. The majority of the Board, however, seem to have overlooked the fact that consultation is only required when the matter in controversy is a proper subject for negotiation under the bargaining agreement. Here, as this Court interprets the agreement, the matter of making the schedule change was a prerogative of management and the railroad was, therefore, under no obligation to discuss it with the brotherhood.

Concerning the transfer of work, the railway company claims that there was no transfer from Huntington since under the new schedule the freight cars were never billed there, but rather to Ashland. It is apparent, however, whether you look upon the schedule change as a transfer of work or not, the majority of the Board have read something into the agreement that is not there. By illustration, Rule 1 merely shows that the collective bargaining agreement covers three groups of employees (Clerical workers, office and station workers, and laborers), and that the hours of service and working conditions for the employees will be as set forth in the agreement. Rule 6 basically states that seniority districts shall not be changed without mutual agreement between the brotherhood and management. From the record before us, the Court is unable to perceive any change in seniority districts. Neither petitioners nor the Board have shown that the schedule change complained of has expanded, lessened, or otherwise changed the seniority district. Thus, in interpreting Rule 6 of the agreement, the inability of petitioners to follow their work to Ashland was not due to a violation of the agreement by the railroad, but rather due to the agreement itself, formed by both parties, prohibiting petitioners from going into another seniority district.

Concerning Rule 3, pertaining to seniority, it states how seniority is established and forfeited and the methods of attaining it. As previously mentioned, the majority of the Board felt that the transferring of work affected petitioners' seniority. However, although being contractual, seniority essentially means that the oldest man in point of service is given the choice of jobs, is the first promoted, and the last laid off. Gunther v. San Diego & Arizona Eastern Railway Co., supra; Siaskiewicz v. General Electric Co., 166 F.2d 463 (2d Cir. 1948). It cannot rightfully be interpreted or said that seniority itself gives a man the right to perform work that does not exist; it is only a means of regulating among the workers their preferential entitlement to perform available work.

Thus, in interpreting these rules, the Board has in effect altered and amended the agreement. To read into this agreement, as the majority of the Board did, that the railroad schedule change or transfer of work should not have been made without first consulting the brotherhood is something that the Board lacked authority to do. Hunter v. Atchison, T. & S. F. Ry. Co., 171 F.2d 594 (7th Cir. 1948). The Fifth Circuit, in Thomas v. New York, Chicago & St. Louis R. Co., 185 F.2d 614, stated:

"Although National Railroad Adjustment Board has jurisdiction under Railway Labor Act to hear an individual's grievance it is not authorized to write a contract for par-

ties nor to create substantive legal rights."

As further stated in Shipley v. Pittsburgh & L. E. R. Co., 83 F.Supp. 722 (W.D.Pa.1949),

"An award before National Railroad Adjustment Board which alters, changes or amends a collective bargaining agreement is usurpation of power granted Board under Railway Labor Act to interpret such agreements."

It is interesting to note here the comments of the dissenting members upon the majority opinion. They reveal that, in reaching their opinion, the majority took into consideration matters dehors the contract which were not proper subjects for consideration. To quote from the minority opinion:

"While it readily apears that equity considerations troubled the majority and strongly influenced its decision in this instance, this Board should have confined itself to interpreting the Agreement Rules as written; equity is not a proper subject for consideration by this Board."

In summary, this controversy would seem more appropriately a matter for negotiation to be worked out together by the brotherhood and management in amending or changing the collective bargaining agreement so as to cover future railway schedule changes rather than asking the Adjustment Board or the courts to make such alterations. Cf. Gunther v. San Diego & Arizona Eastern Railway Co., supra.

So viewed, it is concluded that there is no genuine issue of material fact involved and that the bargaining agreement properly construed and interpreted was not violated by the railway company as claimed by the petitioners. This conclusion is not in conflict with the prior decision of this Court (198 F.Supp. 325), for the import of that decision on Motion to Dismiss went only to the question of whether the Board's award was too vague to be the subject of judicial enforcement.

The Court there held that it was not. The Court was not there concerned with whether the award was erroneous; that question was not there in issue. Here, on Motion for Summary Judgment, we consider for the first time the question of whether the Board misinterpreted the rules of the bargaining agreement and misapplied the law thereto. Here, we conclude that under a correct interpretation of the agreement there was no violation of its terms by the railroad, and this being so, the petitioners accordingly have no cause of action.

Summary judgment will accordingly be awarded the railway company; enforcement of the Board's award and summary judgment for petitioners denied.